UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| URSOLA P. KELLY,<br><br>      Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>*Commissioner of Social Security*,<br><br>      Defendant. | Civil Action No. 18-cv-10711-ADB |

## **MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Ursola Kelly ("Claimant") brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Social Security Disability Insurance ("SSDI") benefits. Currently pending before the Court are Claimant's motion to reverse the Commissioner's decision denying her disability benefits, [ECF No. 13], and the Commissioner's cross-motion for an order affirming the decision, [ECF No. 14]. For the reasons set forth herein, the Court finds that the Administrative Law Judge's decision was supported by substantial evidence and therefore <u>DENIES</u> Claimant's motion to reverse and remand [ECF No. 13] and <u>ALLOWS</u> the Commissioner's motion to affirm [ECF No. 14].

### I.    BACKGROUND

#### A.    Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income [('SSI')] program," which assists the

indigent, aged, and disabled. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered "disabled" if he or she is: "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. . . . The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

### B.     Procedural Background

Claimant filed her application for SSDI benefits on April 2, 2015. [R. 217].[1] She alleges that she became disabled on May 1, 2011 due to multiple sclerosis ("MS"), anxiety, and obsessive compulsive disorder. [R. 15]. Her date last insured was December 31, 2015. [R. 13].

The Social Security Administration ("SSA") initially denied her claim on October 15, 2015 and denied the claim upon reconsideration on March 1, 2016. [R. 141, 145].[2] Claimant's application was reviewed initially, and on reconsideration, by state agency medical consultants, who determined that she was not disabled. [R. 15].

Claimant requested an administrative hearing, which was held on March 13, 2017 before Administrative Law Judge Alexander Klibaner ("ALJ"). [R. 35]. Claimant, who was represented by counsel, appeared and testified at the hearing. [R. 40–63]. On June 15, 2017, the ALJ issued a decision in which he found that Claimant was not disabled. [R. 22]. On February 12, 2018, the SSA Appeals Council denied Claimant's Request for Review. [R. 1]. On April 12, 2018, Claimant filed a timely complaint with this Court and sought review of the Commissioner's decision pursuant to 42 U.S.C. § 205(g). [ECF No. 1 at 1]. On September 30, 2018, Claimant filed a motion for an order reversing the decision of the Commissioner, [ECF No. 13], and on November 1, 2018, the Commissioner filed a cross-motion for an order affirming the decision of the Commissioner, [ECF No. 14].

---

[1] References to pages in the Administrative Record, which were filed electronically at ECF No. 10, are cited as "[R. __ ]."

[2] Claimant filed two claims with the SSA for SSDI benefits. Her first claim was submitted in August 2013, denied initially in January 2014, and denied on reconsideration in June 2014. [R. 77, 133, 136]. Her second claim was submitted in April 2015. [R. 105]. It is Claimant's second claim and the ALJ's decision that is at issue in this case.

3

### C. Factual Background

Claimant was 39 years old when the ALJ's decision was issued. See [R. 40]. She stopped going to school around the tenth grade, but continued her schooling at home until she received the equivalent of a high school diploma. [Id.]. From 2002 until 2010, Claimant worked as a banquet server and a certified nursing assistant ("CNA"). [R. 51–52]. Although the alleged onset date of her disability is May 1, 2011, Claimant stopped working in June 2010, two months before she was due to give birth to her second child. [ECF No. 13-1 at 1; R. 242]. Between May 1, 2011 and December 31, 2015, the date last insured, Claimant was not gainfully employed. [R. 15]. She lives with her husband and two children in Attleboro, Massachusetts. [R. 40].

### D. Medical Evidence

Although Claimant has a long history of fatigue and an MS diagnosis that predates the alleged May 2011 onset of her disability by several years, the Court begins with the medical evidence from around the date of the alleged onset. See [R. 368]. An April 2011 MRI showed that Claimant's lesions, a common symptom of MS, appeared to have become more numerous as compared to a March 2008 MRI, although increased image resolution was a possible cause. [R. 396]. A March 2012 MRI revealed similar lesions. [R. 402].

In September 2012, Claimant met with a neurologist from Angels Neurological Centers. [R. 384]. Claimant reported that she had not had any flare ups of her MS for over a year and a half, but that her legs had begun to feel heavier, she was more tired, and she was having difficulty chasing her two-year-old. [Id.]. The neurologist noted Claimant's symptoms as weakness and fatigue, and they discussed potential symptoms of MS, including pain and memory loss, which Claimant denied experiencing. [ECF No. 13-1 at 3; R. 384–86]. In October 2012,

another MRI showed results similar to Claimant's April 2011 and March 2012 MRIs, and Claimant's neurological and motor examinations were normal. [R. 404–13].

In March 2013, Claimant returned to her neurologist and reported weakness and fatigue. [R. 410]. In July 2013, Claimant again complained of fatigue but denied neurological or psychological symptoms and was instructed to continue taking medication she had been prescribed to stay awake. [R. 416–17]. In November 2013, a nurse practitioner noted that Claimant was "[c]linically doing well, except for fatigue" and that Claimant was going to try switching her medication to Adderall. [R. 440, 443].

In January 2014, at the request of the Commissioner, Dr. Marnee Colburn performed a consultative examination on Claimant following the claim for SSDI benefits. [ECF No. 13-1 at 4; R. 77–78]. Dr. Colburn noted that Claimant described symptoms consistent with obsessive compulsive disorder as well as infrequent panic attacks. [R. 480]. Dr. Colburn assessed that Claimant "does not appear to have [anxiety] symptoms that are substantially difficult for her at this time," but noted that Claimant could "benefit from treatment for her mental conditions." [R. 480–81]. Finally, Dr. Colburn stated that Claimant's primary difficulties appear "somatic in nature (multiple sclerosis)." [R. 480].

In March 2014, Claimant again complained of fatigue to a nurse practitioner, which Claimant attributed to the Adderall that had helped relieve her fatigue initially but had stopped working. [R. 482]. In April 2014, Claimant told her neurologist that she was experiencing facial numbness, leg weakness, continued fatigue, and difficulty walking. [R. 487–88]. For the most part, Claimant's neurological and motor examinations were normal, and her MS was stable although she had mild symptoms. [R. 489–90].

In May 2014, Claimant again saw her primary care physician and reported fatigue and numbness. [R. 507–10]. In September 2014, Claimant also described trouble word finding, fatigue, muscle weakness and stiffness, and difficulty walking. [R. 582–83]. Claimant said that she had "good and bad days" and that her leg weakness was exacerbated by the heat, but that her facial numbness had resolved. [Id.].

In January 2015, Claimant's neurologist conducted another MRI, and Claimant again reported that she had good and bad days, weakness, difficulty word finding, and that she was continuing to use Adderall to help with her fatigue. [R. 608]. Although Claimant also reported muscle cramps, muscle weakness, stiffness, tremors, and difficulty walking, her neurological and motor examinations were normal. [R. 610–611].

In February 2015, Claimant began physical therapy where her medical issues were listed as trunk weakness, hip weakness, easily fatigued, and decreased walking distance. [R. 613]. Claimant indicated that her primary concern was her "[a]mount of fatigue with daily activities." [R. 615]. Claimant was discharged two months later after meeting all goals. See [R. 970].

In March 2015, Claimant saw a second neurologist at Angels Neurological Centers and again said that she had good and bad days, fatigue, muscle cramps, and difficulty walking. [R. 685]. This second neurologist noted that physical therapy was helping Claimant but recommended splitting up daily activities to avoid excessive fatigue. [R. 689]. New MRIs revealed results consistent with Claimant's previous MRIs. [Id.].

In September 2015, Claimant again reported fatigue to her primary care physician, and again told her original neurologist that she had good and bad days, occasional leg weakness, but that her trouble with word finding had resolved. [R. 824, 831]. Claimant's neurological and

motor examinations were normal and Claimant's neurologist assessed that Claimant was "doing well clinically." [R. 826–27].

In October 2015, Dr. Colburn, at the request of the Commissioner, completed a second consultative examination of Claimant. [R. 837]. Dr. Colburn noted that Claimant

> does the cooking, cleaning, drives the children to school, manages laundry, completes bills and does shopping. She volunteers one period/week for her son's preschool where she monitors lunch and recess with additional support. She is able to shop but tends to only go when there are not many other people . . . she frequently finds that she needs to go [to a restaurant] at a time when it is not crowded and has left restaurants if she feels it is too crowded . . . cleaning does get done but depends on her energy level. She does most things "in breaks."

[R. 839]. Dr. Colburn assigned Claimant a Global Assessment of Functioning (GAF) score of 54.[3] [R. 841]. He also noted that Claimant had "removed herself from large settings . . . and consequently [Claimant's] symptoms may have indirectly reduced as a function of her own self-selection out of difficult situations." [R. 840–41]. Dr. Colburn determined that Claimant was "likely capable of functioning in small settings and has the memory to complete basic tasks and concentration to work on simple repetitive tasks without much difficulty. However, [Claimant] would experience anxiety from time-to-time if the work setting increased in number of people surrounding her." [R. 841].

---

[3] The GAF scale

> is used to rate a patient's "overall psychological functioning." The scale goes from "1," indicating that the patient has a "persistent danger of severely hurting self or others," to "100," indicating "superior functioning." A score in the range of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

Lopez-Lopez v. Colvin, 138 F. Supp. 3d 96, 98 n.4 (D. Mass. 2015) (alteration in original) (citations omitted) (quoting Am. Psychiatric Inst., Diagnostic & Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994)).

7

In March 2016, Claimant met with her second neurologist, reported good and bad days and stated that her "legs can be tight and heavy especially with the heat and activity." [R. 843]. Claimant was again advised to split up her daily activities to avoid excessive fatigue. [R. 847]. She returned in May 2016 with the same symptoms. [R. 854]. Claimant was advised to continue her physical therapy exercises at home, and to continue splitting up her daily activities to avoid fatigue. [R. 857]. In October 2016, Claimant again complained of fatigue and malaise to her primary care physician and also reported weakness in the legs and difficulty with stairs. [R. 947–48]. In February 2017, Claimant complained to her second neurologist of difficulty walking and he assessed Claimant's gait to be slow. [R. 901, 904].

In connection with her application for benefits, Claimant told the SSA in September 2013, June 2014, and April 2015 that her frequent activities included getting her children ready for school, taking them to and from school, doing chores such as cleaning and laundry, making simple meals about three times per week, giving her children baths, and grocery shopping a couple times a week for less than an hour. [R. 251–54, 286–89, 314–17]. Claimant also stated that she typically took rests or naps during the day. [R. 286, 314]. Claimant reported receiving help from family members with childcare, cleaning, cooking, and walking the dog. [R. 252, 275, 287, 315–17, 321, 323]. In March 2017, Claimant's mother-in-law, Michelle Kelly, submitted a written statement that the parties stipulate was largely consistent with Claimant's activity reports. [R. 355–56; ECF No. 13-1 at 8; ECF No. 15 at 8].

Between January 2014 and February 2016, Claimant was seen by four state agency reviewing psychologists and four state agency reviewing physicians. [R. 81–89, 97–103, 110–17, 124–31]. All four state reviewing psychologists found that Claimant had no severe mental impairment and no mental residual functional capacity ("RFC") limitation, and all four state

agency reviewing physicians found that Claimant could perform a range of light work as defined under 20 C.F.R. § 404.1567(b). [Id.].

### E. Hearing

On March 13, 2017, Claimant testified at a hearing before the ALJ. [R. 40–63]. Claimant's testimony was consistent with her prior statements made to her treating physicians as described in section I.D., supra.

Vocational expert Amy Versillo also testified at the hearing. [R. 63–74]. She classified Claimant's past work as a CNA as medium in exertion and semi-skilled and Claimant's second occupation as a banquet server as light in exertion and unskilled. [R. 65]. She also testified that, with the limitations identified by the ALJ, a person of the same age, education, language, and work background would not be able to perform Claimant's past work. [R. 65–66]. However, with the limitations identified by the ALJ, a person of the same age, education, language, and work background would be able to perform the sedentary work of a general office clerk, labeler or tagger, shipping checker, or billing clerk. [R. 66–70].

## II. THE ALJ'S DECISION

On June 15, 2017, the ALJ issued a decision finding that Claimant was not disabled under sections 216(i) and 223(d) of the Act. [R. 12–22]. At step one, he found that Claimant had not engaged in substantial gainful activity since the alleged onset date in May 2011. [R. 15]. At step two, he concluded that Claimant had the severe impairments of MS, anxiety, and obsessive compulsive disorder. [Id.]. After a thorough review of Claimant's medical history, the ALJ concluded "that the above impairments cause significant limitation in the claimant's ability to perform basic work activities and are considered severe." [Id.].

At step three, the ALJ determined that "the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." [Id.]; 20 C.F.R. §§ 404.1520(d), 404.1525–26. He further explained:

> I have considered listings 11.09 and 12.06. No treating or examining physician has proffered findings that are equivalent in severity to the criteria of these or any other listed impairment. In reaching this conclusion, I have considered the opinions of the state agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion.
>
> The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listing 12.06. In making this finding, I have considered whether the "paragraph B" criteria were satisfied.

[R. 15 (citations omitted)]. The ALJ then analyzed the four paragraph B criteria at length. [Id.]. He found that Claimant had mild limitations with respect to understanding, remembering, or applying information. [Id.]. The ALJ also concluded that Claimant had moderate limitations with respect to interacting with others, concentrating, persisting, or maintaining pace. [R. 16].

At step four, he made the following findings on Claimant's RFC:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can stand/walk for 4 hrs in an 8-hour workday; occasionally push and pull with her legs; can frequently handle and finger with her right (dominant) hand; can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; should avoid hazards such as unprotected heights and moving mechanical parts; should avoid concentrated exposure to humidity, extreme cold, extreme heat, and all exposure to vibration (such as a jackhammer); needs to avoid crowds of around 100 people of the general public; should avoid lights brighter than a typical business office setting; can interact occasionally with the general public; and in addition to normal breaks, would be off task 10 percent of time in an 8-hour workday.

[Id.]. The ALJ determined that Claimant was not capable of performing past relevant work. [R. 21].

At step five, the ALJ found that "considering the [C]laimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed," *i.e.*, general office clerk, labeler or tagger, shipping checker, billing clerk. [R. 21–22]. The ALJ concluded that Claimant was not disabled at any time from May 1, 2011 through December 31, 2015. [R. 22].

## III. STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). A district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the Court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the Court that was not contained within the administrative record, the Court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the Court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence

which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). The Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the Court's review of the Commissioner's conclusions of law is de novo. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## IV.     DISCUSSION

Claimant presents four reasons why the ALJ's decision should be reversed and remanded: (i) the ALJ erred by failing to consider the testimony of Claimant's mother-in-law, Michelle Kelly; (ii) the ALJ's determination as to Claimant's credibility is not supported by substantial evidence because it fails to identify any evidence that contradicts Claimant's description of the limitations that arise out of her fatigue; (iii) substantial evidence does not support the ALJ's

reliance on the outdated state agency reviewing opinions; and (iv) substantial evidence does not support the RFC finding because the decision identifies no medical source that is consistent with it. [ECF No. 13-1 at 7–20]. In response, the Commissioner asserts that (i) the ALJ was not required to specifically mention Michelle Kelly's testimony; (ii) the ALJ's evaluation of Claimant's credibility is supported by substantial evidence; (iii) the ALJ's reliance on the state agency reviewing opinions was permissible; and (iv) the ALJ's RFC determination is supported by substantial evidence. [ECF No. 15 at 8–18]. The Court agrees with the Commissioner on each of these issues.

### A. The ALJ's Consideration of Michelle Kelly's Testimony

Claimant, relying on Social Security Ruling ("SSR") 06-03p,[4] contends that the ALJ "either missed or arbitrarily disregarded" written testimony from Michelle Kelly, Claimant's mother-in-law, concerning the daily assistance she and Claimant's biological mother provide to Claimant. [ECF No. 13-1 at 8]. Claimant argues that this was reversible error because it contravenes SSR 06-03p, which states that "when we make a determination or decision of disability, we will consider all of the available evidence in the individual's case record. This includes, but is not limited to . . . statements by the individual and others about the impairment(s) and how it affects individual's functioning . . . ." SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). Mrs. Kelly's written testimony, which is dated March 13, 2017 and is part of the record, addresses Claimant's impairment and functioning. [R. 355–56]. Specifically, it explains that Claimant has good days and bad days and, although she "tries her very best to keep up," is easily exhausted from doing chores around the house and often needs to nap during the day. [R. 355–

---

[4] The parties agree that SSR 06-03p, which has since been rescinded, applies to this case. See [ECF No. 13-1 at 7; ECF No. 15 at 9 n.2].

56]. Mrs. Kelly also describes how she and Claimant's biological mother have assisted Claimant with caring for her children. [R. 355–56].

Assuming *arguendo* that Mrs. Kelly's testimony refers to the time period at issue, rather than March 2017, and would have been appropriate for the ALJ to consider under SSR 06-03p, there is not legal support for Claimant's contention that the ALJ was required to reference Mrs. Kelly's testimony by name in his opinion. See Rodriguez v. Sec'y of Health & Human Servs., No. 90-1039, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece."). The ALJ's statement that he carefully considered the entire record, which included Mrs. Kelly's testimony as an exhibit, is sufficient to indicate that the testimony was considered. See [R. 16]; NLRB v. Beverly Enterprises-Mass., 174 F.3d 13, 26 (1st Cir. 1999) (finding that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party").

Even further assuming that it was error for the ALJ to fail to reference Mrs. Kelly's testimony, any such error was harmless. The parties agree that Mrs. Kelly's testimony was consistent with Claimant's testimony, which was considered and assessed by the ALJ, including a detailed explanation of which portions of Claimant's testimony he discounted. See [ECF No. 13-1 at 8; ECF No. 15 at 8]. Claimant's testimony concerning her limitations covers much of the same ground as Mrs. Kelly's testimony, and Claimant identifies no reason why Mrs. Kelly's testimony would not have been discounted for the same reasons her own testimony was. Compare [R. 17 ("She stated that she attempts to do laundry and must sit down to rest. The claimant stated that she naps during the day, is unable to perform many tasks she once could and is unable to function on a good day for 8 hours before needing sleep.")], with [R. 355–56 ("She

14

tries her very best to keep up with things around the house, but must do so on a chore to chore basis. . . . As a result, she finds it necessary to rest during the day (while the children are at school) [when the flare-ups in her symptoms occur]."). Accordingly, the fact that the ALJ's decision does not reference Mrs. Kelly's written testimony by name is not a ground for reversal.

### B. The ALJ's Determination as to Claimant's Credibility

Claimant's assertions that the ALJ applied the wrong burden of proof and failed to identify evidence that contradicted Claimant's account of her fatigue are unavailing.[5] See [ECF No. 13-1 at 11–14]. The ALJ properly found that Claimant's impairments were largely consistent with the evidence of record, but also found that Claimant's statements about the intensity, persistence, and effects of her impairments were inconsistent with the objective medical evidence. See [R. at 19–20]. Although an ALJ must state "specific reasons for the weight given to the individual's symptoms" that are "consistent with and supported by the evidence," SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017),[6] and may not "ignore evidence," "the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence." Boardway v. Berryhill, No. 3:17-cv-30069-KAR, 2018 WL 4323823, at *2 (D. Mass. Sept. 10, 2018); see also Nunes v. Berryhill, 16-cv-11499-LTS, 2017 WL 4169748, at *2–3 (D. Mass. Sept. 20, 2017) ("Determinations of credibility and the resolution of conflicts in the evidence are

---

[5] In light of the ALJ's detailed findings concerning Claimant's credibility, there is no merit to the argument that his use of the phrase "not entirely consistent" suggests that he applied the wrong burden of proof. See [ECF No. 13-1 at 11].

[6] "ALJs were directed to use SSR 16-3p instead of SSR 96-7p when making determinations and decisions regarding a claimant's symptoms on or after March 28, 2016." See Boardway v. Berryhill, No. 3:17-cv-30069-KAR, 2018 WL 4323823, at *13 n.10 (D. Mass. Sept. 10, 2018) (citing SSR 16-3p, 2017 WL 5180304). "The only significant difference between SSR 96-7p and SSR 16-3p is the elimination of the term 'credibility' from the new ruling." Id. (citing Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018)).

for the Commissioner and not for the doctors or for courts . . . ."). District courts give considerable deference to a fact-finder's assessment of a party's credibility and "will rarely disturb" it. Figueroa v. Colvin, No. 14-cv-12399-ADB, 2015 WL 4465350, at *13 (D. Mass. July 21, 2015) (quoting Anderson v. Astrue, 682 F. Supp. 2d 89, 96 (D. Mass. 2010)).

Here, the ALJ cited a variety of appropriate factors in support of his credibility determination, including objective medical evidence showing Claimant's MS symptoms to be stable, the fact that Claimant's treatment was "routine and conservative," the gap in Claimant's treatment for MS from the alleged onset date until September 2012, the minimal mental health treatment received by Claimant, Claimant's report to Dr. Colburn that she was not taking any prescribed medications, and Claimant's reports of daily activities to Dr. Colburn and as described in her Function Reports. [R. 19–20]. These considerations are reasonable and consistent with the Social Security regulations. See, e.g., 20 C.F.R. § 416.929(c)(3) (discussing what factors relevant to symptoms will be considered, including: daily activities, medications, treatments, and "other factors concerning your functional limitations and restrictions"). Accordingly, the Court will not overturn the ALJ's credibility finding.

### C. The ALJ's Reliance on State Agency Reviewing Opinions

Claimant argues that it was reversible error for the ALJ to give "great weight" to state agency reviewing opinions that were outdated, "rendered prior to a substantial change in the medical evidence," "conclusory," and "fail to include any actual explanation or analysis." [ECF No. 13-1 at 15; ECF No. 20 at 4–5]. The ALJ gave "great weight" to the opinions of eight state agency reviewing experts: physicians Drs. Astarjian, McInerny, Kriston, and Wheelock and psychologists Drs. Kellerman, Fischer, Fieman, and O'Sullivan. [R. 20]; see also [R. 81–86, 97–101, 110–15, 124–29].

First, the reviewing opinions were not outdated as Claimant argues. Claimant must establish disability on or before the date last insured to be entitled to a period of disability and disability insurance benefits. "State agency opinions are always rendered at the front-end of the review process, [so] there is necessarily a passage of time between those opinions and the ALJ's decision." Stacey S. v. Berryhill, No. 18-cv-00284-JJM, 2019 WL 2511490, at *7 (D.R.I. June 18, 2019). Here, the state agency opinions at issue were compiled between January 2014 and February 2016, and Claimant's date last insured was December 31, 2015.[7] The opinions are, therefore, a reasonable source for evaluating whether Claimant was disabled on or before her last insured and are not outdated for the purpose of this inquiry. See 42 U.S.C. §§ 423(a)(1)(A), 423(a)(1)(C); [R. 81–89, 97–103, 110–17, 124–31].

Second, the state reviewing agency opinions were not rendered prior to "a substantial change in the medical evidence," as Claimant alleges. See [ECF No. 13-1 at 14; ECF No. 20 at 4–5]. Claimant states that there is "later acquired medical evidence that indicates the impairments may be worse or different" than what the reviewing physicians were able to assess, but does not provide any examples. See [ECF No. 20 at 5]. State agency reviewing opinions may be relied upon if "the [s]tate agency physicians were able to consider most if not all of the medical records that are relevant to [Claimant]'s claim of disability during the [relevant time period]." Peltonovich v. Colvin, No. 13-cv-11246-JGD, 2014 WL 4716190, at *12 (D. Mass. Sept. 19, 2014). The only medical evidence cited by the parties as not being available for the state reviewing agencies to consider is a portion of Claimant's physical therapy records from Sturdy Memorial Hospital. See [ECF No. 13-1 at 17; ECF No. 15 at 11]. Claimant began

---

[7] The dates of the opinions are as follows: Dr. Kellerman (January 27, 2014), Dr. Astarjian (January 27, 2014), Dr. Fischer (June 24, 2014), Dr. McInerny (June 12, 2014), Dr. Kriston (September 23, 2015), Dr. Fiernan (October 14, 2015), Dr. O'Sullivan (February 26, 2016), and Dr. Wheelock (February 29, 2016). [R. 84, 88, 98, 103, 115, 117, 126, 131].

17

physical therapy on February 23, 2015, and her primary concern during her first visit was "amount of fatigue with daily activities." [R. 615]. The records indicate that Claimant reported "trunk weakness" and "easily fatigued," however, Claimant was discharged from physical therapy after two months having met two of her three long-term goals and achieving 80% of a third long-term goal. [R. 970]. Nothing about these records indicates a "substantial change" in the medical evidence documenting Claimant's symptoms from her MS; indeed, these records are consistent with the existing medical records documenting Claimant's reports of trunk weakness and fatigue. See, e.g., [R. 17–19]. Therefore, it was not error for the ALJ to rely on opinions by the eight state reviewing physicians and psychologists where they had access to "most of the medical evidence" relevant to Claimant's disability as of the date last insured. See Peltonovich, 2014 WL 4716190, at *12; cf. Padilla v. Barnhart, No. 05-1883, 2006 WL 2008108, at *3 (1st Cir. July 19, 2006) (noting that where the opinions or assessments of consulting physicians are based on an incomplete record, it may counsel against assigning controlling weight to those opinions).

Finally, Claimant contends that the reviewing agency opinions are "rubberstamps" of prior opinions or merely "conclusory" and, as such, should not have been afforded "great weight" by the ALJ. [ECF No. 13-1 at 15–17; ECF No. 20 at 5–6]. The regulations require ALJs to consider the opinions of state agency medical or psychological consultants, who are assumed to be "highly qualified and experts in Social Security disability evaluation." See 20 C.F.R. §§ 404.1527(e), 404.1513a(b)(1). The weight given to non-examining physicians "depend[s] on the degree to which they provide supporting explanations for their medical opinions." Id. § 404.1527(c)(3). Here, Claimant specifically takes issue with the Disability Determination Explanation ("DDE") on reconsideration by Drs. O'Sullivan and Wheelock. See

[ECF No. 13-1 at 15–17]. Claimant's characterization of the DDE as containing "virtually no 'explanation,'" [id. at 17], however, is inaccurate and does not reflect the narrative portions provided by Drs. O'Sullivan and Wheelock that include factual findings from their review of the record, see [R. 124–29]. This case does not present a situation similar to Ormon v. Astrue, 497 F. App'x 81 (1st Cir. 2012), in which the First Circuit concluded that the conclusory statement that Claimant had no sensory or motor problems, standing alone, was insufficient to support an RFC assessment. 497 F. App'x at 84. The explanations provided by Drs. O'Sullivan and Wheelock are more robust than the opinion considered in Ormon, and it was not error for the ALJ to assign them great weight.

### D. The ALJ's RFC Finding

Claimant's final argument is that the ALJ's RFC finding is not supported by substantial evidence because it was not consistent with the medical opinions in the record and does not properly account for how frequently Claimant was likely to be off-task or absent. [ECF No. 13-1 at 18–20]. The RFC finding stated that Claimant could "perform light work," but "would be off task 10 percent of time in an 8-hour workday" and would "need[] to avoid crowds of around 100 people of the general public" and "lights brighter than a typical business office setting." [R. 16].

An RFC finding is not a medical determination and must be based upon "all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 416.920(e). An ALJ also has the authority to "piece together the relevant medical facts from the findings and opinions of multiple physicians" when making an RFC finding. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). The ALJ's RFC finding will not be overturned so long as it is supported by substantial evidence. See Patoski v. Berryhill, No. 18-1904, 2019 WL 2574591, at *1 (1st Cir. June 24, 2019); see also Land v. Comm'r of Soc. Sec., 494 F. App'x 47, 50 (11th

Cir. 2012). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consol. Edison Co., 305 U.S. at 229).

Here, the Court finds that there is "more than a mere scintilla" of evidence to support the ALJ's RFC determination, and, thus, will not reverse the ALJ's decision. See id. (quoting Consol. Edison Co., 305 U.S. at 229). Although Claimant argues that the ALJ made medical judgments that are contrary to the state agency reviewing opinions to which he granted great weight, the ALJ indicated that his RFC determination was "[b]ased on the record as a whole, including all of the [C]laimant's severe impairments, both singly and in combination, and consistent with the notes, findings and opinions of the [C]laimant's treating physician and other non-treating physicians that are discussed above." [R. 20]. The ALJ appropriately pieced together relevant medical facts from several physicians and the vocational expert in making his RFC finding, and his RFC finding is sufficiently supported. Therefore, the Court will affirm the ALJ's decision.

## V. CONCLUSION

For the reasons stated herein, the Court finds that the ALJ's decision was supported by substantial evidence and therefore DENIES Claimant's motion to reverse and remand [ECF No. 13] and ALLOWS the Commissioner's motion to affirm [ECF No. 14].

**SO ORDERED.**

July 31, 2019 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

20